**UNITED STATES of America**

v.

**Dan W. TIMBERLAKE, Appellant.**

**No. 89–3045.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 8, 1989.

Decided Feb. 23, 1990.

W. Gary Kohlman, Washington, D.C., was on the brief, for appellant.

Brenda J. Johnson, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher and Elizabeth Trosman, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before WALD, Chief Judge, EDWARDS and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

This is an appeal from a judgment of the District Court denying the appellant's motion to suppress physical evidence seized by police officers during a warrantless search of his mother's apartment. On February 13, 1988, three plainclothes police officers went to the apartment building in which appellant Daniel Timberlake lived with his mother, in search of a "lookout" suspect who had sold drugs to an undercover police officer. Upon entering the first-floor hallway of the building, the officers observed two young men playfully spraying an aerosol can in front of the Timberlakes' apartment. While the door of the apartment was open briefly, the officers noticed several young men inside, one or two of whom might fit the description of the "lookout." The two young men who were seen in the hallway returned to the apartment and shut the door after the plainclothes officers had entered the area. The officers noticed nothing more, but one of the officers remarked to his Sergeant that he thought he detected a scent of phencyclidine ("PCP") in the area of the apartment. Neither the Sergeant nor the third officer claimed to have smelled anything. Nonetheless, without seeking to obtain a search warrant, the officers immediately went to the apartment door, knocked on it, announced that they were police, and then entered without permission as soon as someone had opened the door. Upon entering the apartment, the officers secured the area, attempted to obtain consent to search from Geraldine Timberlake, the appellant's mother, and then searched. This search uncovered a handgun and drugs, including PCP.

The District Court held that the officers were justified in entering Mrs. Timberlake's home without her consent and without a warrant because they faced "exigent circumstances." We reject this conclusion as unsupported by the record. The Supreme Court has made it clear that "the police bear a heavy burden when attempting to demonstrate an urgent need that might justify [a] warrantless search[ ]" of a person's home. *Welsh v. Wisconsin,* 466 U.S. 740, 749–50, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984). The Government has not come close to meeting that "heavy burden" in this case. The judgment of the District Court on the motion to suppress is therefore reversed.

## I. BACKGROUND

### A. *Facts*

At approximately 10:30 p.m. on February 13, 1988, members of a District of Columbia Metropolitan Police Department Narcotics Task Force received a "lookout" call on the police radio. The lookout directed them to look for a black male, short, heavy set, wearing blue sweat pants and a red top. *See* Suppression Hearing Transcript ("Tr.") 70 (testimony of Sergeant Poole). The lookout advised the officers to seek this suspect in an apartment building at 1649 W. St., Southeast, in Washington, D.C.

Three officers responded to the lookout directive: Sergeant Poole, the commanding officer, and officers Allen and Knox. The officers arrived at the building in plainclothes, with no visible police radio or other visible signs indicating that they were police officers. As the commanding officer testified, the officers had successfully dis-

guised themselves so that they not only did not appear to be police officers, but also might even have appeared to be potential drug purchasers. *See id.* at 71, 86–87 (testimony of Sergeant Poole).

Once inside the building, on the first floor, they could see down the hallway to Apartment 102—the apartment in which appellant Timberlake lived with his mother. The officers observed that the door of Apartment 102 was opened briefly; that two young men were playfully spraying an aerosol can in front of the apartment; that there were several young men inside the apartment, one or two of whom might have fit the lookout description; and that the two young men who had been in the hallway returned to the apartment and closed the door soon after seeing the three plainly dressed strangers in the hallway. The officers observed nothing else of note, but Officer Allen remarked to the Sergeant that he thought that he smelled PCP in the hallway. Neither Sergeant Poole nor Officer Knox claimed to have smelled anything.

Without anything more to go on, and without making any effort to secure a warrant, the three officers immediately went to the apartment door and knocked on it, loudly announcing "police, open the door," or words to that effect. *See id.* at 28 (testimony of Officer Allen). Within a few seconds someone within opened the door. The three officers immediately entered the apartment without consent and ordered everyone therein into the living room. Sergeant Poole then searched one or two of the bedrooms—on a hunch, he later testified—finding a handgun in what turned out to be appellant Timberlake's room. Up to this point the officers took no action other than "securing" the apartment and engaging in a "protective" warrantless search that turned up the handgun.

After his initial search, Sergeant Poole ascertained that the apartment was rented to Mrs. Timberlake, the appellant's mother. While interrogating Mrs. Timberlake, Sergeant Poole received word that the lookout suspect had been arrested outside the apartment. Nevertheless, Sergeant Poole prevailed upon Mrs. Timberlake to sign a piece of paper which, the Government contends, indicated her consent to allow the officers to search the apartment. After Mrs. Timberlake signed this piece of paper, Sergeant Poole directed the other officers to search the apartment. Between the time when they entered the apartment and the time when Sergeant Poole told the other officers to search, from five to ten minutes had elapsed. *See id.* at 40 (testimony of Officer Allen). The search uncovered quantities of cocaine, several jars of liquid PCP, and some marijuana. The next day some officers returned to the apartment with a search warrant, searched, and retrieved a second weapon.

## B. *Procedural*

Timberlake moved to suppress the physical evidence seized during the two searches. After a suppression hearing, the District Court issued an opinion denying Timberlake's motion on the ground that "exigent circumstances" justified the officers' warrantless search.

In rejecting the motion to suppress, the trial court stated: "The officers entered the apartment without a warrant because they were able to smell the odor of PCP. They knew that PCP was dangerous and explosive and they realized that if they did not enter the apartment and investigate the odor that any drugs that were in the apartment might be destroyed by the occupants." *United States v. Timberlake,* Criminal No. 88–0077, slip op. at 3–4, (D.D.C. Sept. 28, 1988), *reprinted in* A. 91–92. The District Court also believed that, because the officers saw young men outside Apartment 102 spraying an aerosol can, there was "a suggestion that someone in the apartment was attempting to cover-up the odor of PCP." *Id.* at 4, *reprinted in* A. 92. Finally, the trial court thought that it was significant that, when the apartment door had been briefly open, the officers had noticed one or two persons who might fit the description of the lookout. "Under these facts," the trial court concluded that the officers' "knocking on the door and subsequent entry into the apartment was [sic] fully warranted because they had an obligation to investigate what

they had seen and what they could smell." *Id.* at 5, *reprinted in* A. 93. This conclusion led the District Court to hold that, under *United States v. Socey,* 846 F.2d 1439 (D.C.Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 152, 102 L.Ed.2d 123 (1988), the warrantless entry was "justified by exigent circumstances because the police officers feared the imminent destruction of evidence." *Id.* at 4, *reprinted in* A. 92.[1]

Timberlake entered a conditional plea of guilt to one count of unlawful possession with intent to distribute 100 grams or more of PCP, subject to his right to appeal the denial of the motion to suppress. That is the appeal now before this court.

## II. ANALYSIS

It is clear that the officers had no grounds to enter the apartment without a warrant on the assumption that one or two of the men they had seen might match the description of the lookout suspect. The Government conceded this point in its brief and at oral argument. Thus, absent some legally cognizable "exigency" giving rise to an "urgent need," *Welsh,* 466 U.S. at 750, 104 S.Ct. at 2097, the officers' warrantless entry of Mrs. Timberlake's home was "per se unreasonable." *Coolidge v. New Hampshire,* 403 U.S. 443, 478, 91 S.Ct. 2022, 2044, 29 L.Ed.2d 564 (1971).

The opinion of the District Court appears to suggest that two "exigencies" faced the officers when they were in the apartment building hallway: one, that they feared imminent destruction of evidence, *Timberlake,* slip op. at 4, *reprinted in* A. 92; the other, that "they were able to smell the odor of PCP," *id.* at 3, *reprinted in* A. 91. It is noteworthy that the District Court never found that the officers entered the apartment because of any dangerous circumstance. Rather, the trial court found only that the officers entered the apartment "because they were able to smell the

odor of PCP," and because "they realized that if they did not enter the apartment and investigate the odor that any drugs that were in the apartment might be destroyed by the occupants." It is true that the District Court also said that the officers "knew that PCP was dangerous and explosive," but there is no evidence that they entered the apartment because they reasonably concluded that they faced a dangerous circumstance.

"When faced with a claim of exigent circumstances, we review the district court's legal conclusions on this issue under a *de novo* standard, ... but review its factual findings under the clearly erroneous standard." *Socey,* 846 F.2d at 1445 (citations omitted). In this case, we hold that the record does not support any contention that exigent circumstances justified the officers' actions, and that, therefore, the District Court erred in holding that the Government met its heavy burden of justifying the warrantless entry into Mrs. Timberlake's home.

### A. The Alleged "Consent" to Search

The parties disagree as to whether Mrs. Timberlake gave *voluntary* "consent" to Sergeant Poole to allow the officers to search after they had entered the apartment. We hold that, even if Mrs. Timberlake agreed to allow the officers to search her home, her alleged "consent" was tainted by the preceding illegal entry (*i.e.,* the officers' entry without a warrant, with no exigent circumstances and without permission), because there was no evidence that the illegality of the initial entry, which violated Timberlake's Fourth Amendment right, was attenuated before the police endeavored to obtain Mrs. Timberlake's consent. Thus, the alleged "consent" to search was no more valid than the entry itself. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441

---

1. The District Court went on to offer several additional findings of fact and conclusions of law, among which were: that the officers had a right to "secure" the apartment, a right that included the search in which Sergeant Poole uncovered the gun in Daniel Timberlake's room; that Mrs. Timberlake had consented to the search of the whole apartment; that the officers reasonably believed that she had authority to do so; that the officers could not leave the apartment to get a search warrant because by the time they would have returned all drug evidence would have been destroyed. *See id.* at 5–6, *reprinted in* A. 93–94.

(1963).[2] Indeed, *the Government does not dispute this point;* rather, the Government argues only that "[n]either the police entry into the premises nor the failure of the police to leave when they learned of the drug seller's apprehension could have tainted Mrs. Timberlake's consent since neither was unlawful." Appellee's Brief at 21. We have rejected the Government's claim that the entry into Mrs. Timberlake's home was lawful; therefore, the Government's argument fails.

### B. *Exigent Circumstances*

■ It is a "basic principle of Fourth Amendment law that searches and seizures inside a man's house without warrant are *per se* unreasonable in the absence of some one of a number of well defined 'exigent circumstances.'" *Coolidge v. New Hampshire,* 403 U.S. 443, 477–78, 91 S.Ct. 2022, 2043–44, 29 L.Ed.2d 564 (1971). Accordingly, the Supreme Court has "emphasized that exceptions to the warrant requirement are 'few in number and carefully delineated,' ... and that the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches...." *Welsh v. Wisconsin,* 466 U.S. 740, 749–50, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984) (quoting *United States v. United States District Court,* 407 U.S. 297, 318, 92 S.Ct. 2125, 2137, 32 L.Ed.2d 752 (1971)). Among those carefully delineated exceptions are destruction of evidence, *see Schmerber v. California,* 384 U.S. 757, 770–71, 86 S.Ct. 1826, 1835–36, 16 L.Ed.2d 908 (1966); *United States v. Socey,* 846 F.2d 1439, 1444–45 (D.C.Cir.1988) and "'[t]he need to protect or preserve life or avoid serious injury,'" *Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978) (quoting *Wayne v. United States,* 318 F.2d 205, 212 (opinion of Burger, J.)).

### 1. Destruction of Evidence

This court has noted that "the police must have an objectively reasonable basis for concluding that the destruction of evidence is imminent. This standard focuses on what a reasonable, experienced police officer would believe if he observed the events in question as they unfolded." *Socey,* 846 F.2d at 1446. To conclude that the officers reasonably feared destruction of evidence so imminent that they could not obtain a warrant—even under the expedited telephonic warrant procedure, *see McEachin v. United States,* 670 F.2d 1139, 1147 (D.C.Cir.1981)—the District Court had to find that the police, at the time they entered the apartment, feared that the evidence would be destroyed, and that a reasonable police officer would have believed that persons in the apartment knew that the three men were police officers and would destroy the evidence before a search warrant could be obtained.

Sergeant Poole testified that the officers were dressed in plainclothes in a ruse probably so effective as to convey the impression that they were potential drug purchasers. *See* Tr. 71, 86–87. Nothing else in the record suggests that these plainclothes officers were identifiable, or were in fact identified, as officers. Nor does the record in any way suggest that the officers heard anything on the other side of the apartment door indicating that its occupants were destroying or about to destroy evidence. *Cf. United States v. Bonner,* 874 F.2d 822, 825, 826–27 (D.C.Cir.1989) (exigent circumstances justified warrant-executing officers' failure fully to comply with "knock and announce" statute where, *inter alia,* "officers heard sounds consistent

---

**2.** In *Wong Sun,* the Court held that evidence is inadmissible when obtained in exploitation of a prior illegal entry. *See also United States v. Cherry,* 759 F.2d 1196, 1210–11 (5th Cir.1985) (consent to search following illegal arrest ineffective to cure taint of illegality unless Government proves "a sufficient break in events to undermine the inference that the consent to search was caused by the fourth amendment violation"); *cf. Oregon v. Elstad,* 470 U.S. 298, 301–06, 105 S.Ct. 1285, 1288–92, 84 L.Ed.2d 222 (1985) ("evidence ... discovered as a result of a search in violation of the Fourth Amendment must be excluded"); *Taylor v. Alabama,* 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982) (petitioner's confession was impermissible fruit of his illegal arrest, even though he had been advised of his rights three times); *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (same).

with ... destruction of the object of the search"); *United States v. Frierson,* 299 F.2d 763 (7th Cir.1962) (exigent circumstances where police heard through partially open door "Get rid of the stuff; get rid of the spoon").

It is of course true that once the officers knocked on the door and "shouted 'police, police open up,'" *Timberlake,* slip op. at 2, *reprinted in* A. 90, those inside the apartment had some reason to know who the officers were. However, it is equally clear that "police officers cannot deliberately create exigent circumstances to justify a warrantless entry into a private dwelling." *Socey,* 846 F.2d at 1448 (citations omitted). The record contains no evidence that the police, when they knocked on the door, intended anything other than a warrantless search of the apartment.

2. **Threat to Life**

The District Court's suggestion that the officers' belief in an imminent PCP-fume-induced explosion was a justifying exigency is equally devoid of record support. An "expert" witness for the Government testified that, under some circumstances, large quantities of PCP can explode. However, nothing in the testimony of this witness established that the smell of PCP alone could lead a reasonable officer to conclude that the officers had to act immediately "to protect or preserve life or avoid serious injury." *See Mincey,* 437 U.S. at 392, 98 S.Ct. at 2413. On the most generous reading of this witness' testimony, he might be understood to have asserted that very high levels of PCP-fumes may *sometimes* signal imminent threat of harm or loss of life from explosion. However, it is quite clear on the record that the officers did not face

any such high level of fumes and that their search of the apartment was not justified by any concern for the public safety.

Only Officer Allen testified that he smelled PCP in the hallway and that he mentioned the smell to his superior officer, Sergeant Poole. *See* Tr. 27, 35. Officer Allen did not testify that he thought that the PCP threatened to explode, nor is there any other evidence to indicate that there were enough fumes in the hallway for a reasonable person to fear an explosion.[3] Sergeant Poole testified that he did not even recognize the smell of PCP until *after* he entered the apartment. *See id.* at 75. Indeed, his testimony on the point indicates that his concern about PCP was almost casual. *See id.* at 72 ("To the best of my recollection, a comment was made about the odor of PCP. I don't know who made it. It wasn't myself, but I don't know who made it."). It is hardly surprising that the Sergeant seemed so casual given that only one officer even noticed any smell in the hallway.[4]

We have no doubt that, on the record before us, the Government failed to carry its burden to show that the officers acted lawfully in entering the apartment without a warrant; the evidence plainly does not support a finding that the officers' conduct was justified by some "urgent need" to act "to protect or preserve life or avoid serious injury." The District's Court's suggestions to the contrary simply find no support on the record. Even if we give the most generous reading to the testimony of the Government's expert—and assume that very high levels of PCP-fumes may sometimes signal imminent danger—there is nothing in the evidence to indicate that the

---

**3.** Officer Allen did testify that he smelled very strong fumes of PCP *after the door to the apartment was opened.* However, as we have already noted, *see* part II.A.1, *supra,* police officers cannot pound on an apartment door, demand entry, enter without consent, and then attempt to justify a claim of "exigent circumstances" on the basis of what was smelled or seen as they were *entering* the apartment. The critical point here is that there was no exigent circumstance justifying a police demand for admission, and subsequent entry, into Mrs. Timberlake's home without her permission.

**4.** We also note that once the officers made their warrantless entry, they behaved wholly inconsistently with any reasonable belief that a PCP-fume-induced explosion was about to occur. *Cf. Mincey,* 437 U.S. at 393, 98 S.Ct. at 2413 ("a warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation.'" (quoting *Terry v. Ohio,* 392 U.S. 1, 26, 88 S.Ct. 1868, 1882, 20 L.Ed.2d 889 (1968)))

officers faced such a situation when they decided to enter Mrs. Timberlake's home without a warrant. Therefore, there was no exigent circumstance justifying the warrantless entry.

### III. CONCLUSION

The District Court erred in concluding that the Government met its heavy burden of demonstrating an urgent need for a warrantless search. Accordingly, we reverse.

*So ordered.*