962 F.2d 1076
 295 U.S.App.D.C. 284
 NOTICE: D.C. Circuit Local Rule 11(c) states that unpublished orders, judgments, and explanatory memoranda may not be cited as precedents, but counsel may refer to unpublished dispositions when the binding or preclusive effect of the disposition, rather than its quality as precedent, is relevant.
UNITED STATES of America,
v.
James KING, a/k/a Raymond Bovell, Appellant.
 No. 91-3160.
 United States Court of Appeals, District of Columbia Circuit.
 May 19, 1992.
 
 Before WALD, STEPHEN F. WILLIAMS and RANDOLPH, Circuit Judges.
 JUDGMENT
 PER CURIAM.
 
 
 1
 This cause came to be heard on the appeal of the defendant from the judgment of the District Court, and it was briefed and argued by counsel. The issues have been accorded full consideration by the Court and occasion no need for a published opinion. See D.C.Cir.Rule 14(c). For the reasons stated in the accompanying Memorandum, it is
 
 
 2
 ORDERED and ADJUDGED, by the Court, that in No. 91-3160, the judgment is affirmed.
 
 
 3
 The Clerk is directed to withhold issuance of the mandate herein until seven days after disposition of any timely petition for rehearing. See D.C.Cir.Rule 15.
 
 MEMORANDUM
 
 4
 Appellant James King was indicted on charges of possession with intent to distribute in excess of fifty grams of cocaine base, in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(A)(iii), and using and carrying a firearm during a drug trafficking crime, in violation of 18 U.S.C. § 924(c). Claiming a violation of his rights under the Fourth Amendment, appellant moved to suppress the drugs and firearm seized at the time of his arrest. The district court denied appellant's motion and appellant thereafter entered a conditional plea of guilty. Appellant was sentenced to 168 months of incarceration, followed by 5 years of supervised release. He now appeals the denial of his motion to suppress as well as the sentence imposed. We affirm on both issues.
 
 I. Background
 
 5
 The facts, as found by the district court, are as follows. At approximately 1:00 a.m. on March 16, 1988, Detective Lorren Leadmon entered an apartment building at 3525 Jay Street, N.W., in order to take photographs of apartment 201, the scene of a prior crime. While in the hallway of the building, Howard Cartledge, then occupying apartment 204, opened his door and asked Officer Leadmon if he wished to speak with him. The two men knew each other as a result of Leadmon's investigation of two prior incidents. In December 1988, a police officer had been shot in front of the building by someone inside apartment 204. Transcript of Motions Hearing (June 21, 1988) ("Tr. I") at 5. In January, Officer Leadmon and a partner "walked into" a shootout between two rival groups and followed the suspects into that same apartment. Tr. I at 6. Both men entered Cartledge's apartment.[1]
 
 
 6
 Once inside the apartment while speaking to Cartledge, Officer Leadmon heard a great deal of noise and movement coming from the upstairs of the apartment. Out of concern for his personal safety, Leadmon started up the stairs without objection from Cartledge. Officer Leadmon did not recall whether he asked permission from Cartledge to proceed upstairs. However, two private investigators (one hired by appellant and one hired by appellant's co-defendant) both testified that Cartledge told them that Officer Leadmon had asked for permission to go upstairs and that Cartledge had given such permission.
 
 
 7
 After reaching approximately the third or fourth step, Officer Leadmon was able to see into one of the upstairs bedrooms. The door was open. Through the crack in the door, Officer Leadmon saw appellant seated in a chair behind the door. Officer Leadmon also saw appellant's co-defendant, Michael Andrews, sitting on the floor with his hand under the carpet. Officer Leadmon noticed a large lump under the carpet and ordered Andrews to back away from the lump. Fearing that the lump was a weapon, Officer Leadmon went over to the lump, lifted the carpet, and discovered a plastic bag containing a large quantity of crack cocaine.
 
 
 8
 Officer Leadmon called for backup to help arrest the two men. Shortly thereafter, Officers Dicks and Loftus entered the premises, at which time appellant and Andrews were arrested. While standing in the bedroom, Officer Loftus noticed a small automatic weapon on a shelf in an open closet in the bedroom.[2] The officers retrieved the gun. When appellant was searched at the police station, the police officers found $3,270 in his crotch.
 
 II. Discussion
 A. Appellant's Fourth Amendment Claim
 
 9
 Appellant argues that the drugs and weapon seized from the apartment were the product of an illegal search and therefore should have been suppressed. The government, citing Rakas v. Illinois, 439 U.S. 128 (1978) (passengers not entitled to challenge search of car and seizure of evidence therefrom), and Minnesota v. Olson, 110 S.Ct. 1684 (1990) (overnight guest entitled to challenge search of premises), responds that appellant, as to whose status in the apartment the record is unclear, did not have a "legitimate expectation of privacy" in the apartment and therefore cannot challenge the search and seizure at issue in this case.
 
 
 10
 We need not decide the somewhat difficult question of whether someone who is less than an overnight guest may have Fourth Amendment rights of privacy in an apartment, however, because even assuming that appellant had such rights of privacy in the apartment, we find no Fourth Amendment violation in this case. Both the search of the upstairs of Cartledge's apartment and the resulting seizure of the drugs and the gun were proper. There was thus no basis for denying their admission into evidence and the district court properly denied appellant's motion to suppress.
 
 1. Consent to Search
 
 11
 It is well-established that a search conducted pursuant to voluntary consent does not violate the Fourth Amendment's prohibition on unreasonable searches. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). In this case, the district court found that Cartledge invited appellant into the apartment and consented to Officer Leadmon's search of the upstairs. United States v. Michael Andrews and James King, Crim. No. 88-0138 (D.D.C. July 12, 1988) (Memorandum Order) at 5-6. In light of the supporting testimony of Officer Leadmon and the two private investigators, those findings are not clearly erroneous.
 
 
 12
 Of course, Cartledge's consent to search the premises is only valid if Cartledge, a "third party" in this incident, had the actual or apparent authority to give such consent. In order for the government to rely on the consent of a third party, it must prove by a preponderance of the evidence that the third party either actually possessed, or reasonably appeared to possess, "common authority over or other sufficient relationship to the premises ... to be inspected." United States v. Matlock, 415 U.S. 164, 171 (1974); see also Illinois v. Rodriguez, 110 S.Ct. 2793, 2801 (1990).
 
 
 13
 Officer Leadmon testified that as a result of his investigation of the prior incident at apartment 204 he knew that Cartledge had been residing in the apartment, as a guest of the lessee, at least since December 1987 and that Cartledge had stayed on in the apartment when the lessee moved out in late January or early February. Tr. I at 6-7. Further, Cartledge himself told one the investigators that at the time of the search and seizure he was staying at the apartment at the invitation of the lessee. Tr. I at 73-74. Based on this evidence, the government clearly met its burden of proving that Cartledge, who had been living in the apartment for months, had a "sufficient relationship to the premises" to be able to effectively consent to a search of the upstairs.
 
 
 14
 2. The Search under the Carpet and the Seizure of the Drugs
 
 
 15
 While Officer Leadmon had Cartledge's consent to go upstairs, that consent did not encompass permission to search the area under the carpet in the bedroom. The government argues, however, that that warrantless search was justified under the "exigent circumstances" exception to the warrant requirement. We agree.
 
 
 16
 "[W]arrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." Mincey v. Arizona, 437 U.S. 385, 393-94 (1978). As this court has noted, the potential for imminent harm to a police officer is one of "the most common and compelling bases to establish exigency." United States v. Bonner, 874 F.2d 822, 826 (D.C.Cir.1989). In determining whether such an exigency existed, we must consider "what a reasonably, experienced police officer would believe if he observed the events in question as they unfolded." United States v. Timberlake, 896 F.2d 592, 596 (D.C.Cir.1990) (internal quotation omitted).
 
 
 17
 Officer Leadmon approached the upstairs bedroom with the knowledge that apartment 204 had been a center of drug and gun activity, and that a police officer had been shot from the apartment. Tr. I at 5-6, 8-9. In light of the history of violence emanating from that apartment, Officer Leadmon was justifiably concerned for his safety when he looked into the bedroom and saw one man apparently hiding behind the bedroom door and another with his hand apparently reaching for something under the carpet. Officer Leadmon testified that he could not tell what the item was under the carpet, but he was concerned that it might be a gun. Tr. I at 11. Indeed, in response to counsel's question as to why he did not obtain a warrant before pulling back the carpet, Office Leadmon testified: "I didn't want to try to back away from it; if it was a weapon I could have got shot." Tr. I at 12.
 
 
 18
 Viewed in context, Officer Leadmon had reason to believe the item under the carpet posed an immediate threat to his safety. That threat created an "exigent circumstance" that justified his warrantless search of the area under the carpet. Because that search was proper, there was no basis for suppressing the fruits of the search, the illegal drugs seized. The district court thus committed no error in denying appellant's motion to suppress the drugs seized from under the carpet.
 
 3. The Seizure of the Weapon
 
 19
 The police also seized a weapon from a closet in the bedroom. This seizure too was effected without a warrant, but the police conduct here falls squarely within yet another exception to the general warrant requirement: the plain view exception.
 
 
 20
 The plain view exception permits a warrantless seizure of evidence that is in "plain view" as long as the police have not violated the Fourth Amendment in arriving on the premises. Coolidge v. New Hampshire, 403 U.S. 443, 465-68 (1971). Both elements are satisfied in this case. The gun was in plain view of the bedroom, Tr. I at 14, and Officer Loftus, having responded to Officer Leadmon's call for assistance in the arrest of appellant and Andrews, was legitimately on the premises. There was thus no police misconduct in the seizure of the gun and, as such, no basis to exclude it from evidence.
 
 
 21
 In sum, the district court committed no error in denying appellant's motion to suppress the drugs and weapon seized from apartment 204.
 
 B. Appellant's Sentencing Challenge
 
 22
 In determining appellant's sentence under the federal Sentencing Guidelines, the district court increased appellant's offense level by two increments on the grounds that appellant possessed a firearm during the commission of the offense. See U.S.S.G. § 2D1.1(b). In United States v. Burke, 888 F.2d 862 (D.C.Cir.1989), this court held that the 1988 version of the Sentencing Guidelines (the version under which appellant was sentenced) required a finding of scienter before an enhancement could be imposed under § 2D1.1(b). Appellant challenges the district court's finding that he had the requisite scienter to support the two-level enhancement.
 
 
 23
 Under Burke, scienter is demonstrated "where it is shown that the defendant knew that he was in possession of a weapon." Id. at 867. Such possession can be actual or constructive, as where the defendant had "knowing dominion and control" over the weapon. Id. at 867-68 (emphasis deleted and internal quotation omitted). Of course, whether an individual "knowingly" possessed a weapon can be inferred from circumstantial evidence. United States v. Sterley, 764 F.2d 530, 532 (8th Cir.), cert. denied, 474 U.S. 1013 (1985); United States v. Gallo, 543 F.2d 361, 369 n. 6 (D.C.Cir.1976). We review the district court's finding of scienter under a clearly erroneous standard. United States v. Suarez, 911 F.2d 1016, 1018 (5th Cir.1990).
 
 
 24
 In ruling that appellant had the requisite scienter in this case, the district court noted that the weapon was in plain view, a large amount of drugs were discovered in the room, and a substantial amount of money was found on appellant's person. Transcript of Sentence (May 30, 1991) at 15-16. We think the evidence amply supports the inference the appellant had the gun in the room in order to protect the drugs and the money. In any event, we certainly cannot say that the district court's finding of scienter is clearly erroneous. There was thus no error in the two-level enhancement imposed by the district court.
 
 III. Conclusion
 
 25
 For the reasons given, the rulings of the district court are affirmed.
 
 
 26
 It is so ordered.
 
 
 
 [1]
 The district court noted that two private investigators, one retained by appellant and one retained by appellant's co-defendant, presented a slightly different version of events. The investigators testified that Cartledge told them that Officer Leadmon had knocked on Cartledge's door and that Cartledge had opened the door and permitted Leadmon to enter
 
 
 [2]
 Officer Leadmon testified that the closet door had been knocked off its hinges and was laying sideways on the floor of the bedroom