# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 07-966


**STATE OF LOUISIANA**

**VERSUS**

**KIMBERLY M. SCALLION**


**\*\*\*\*\*\*\*\*\*\***


APPEAL FROM THE
TENTH JUDICIAL DISTRICT COURT
PARISH OF NATCHITOCHES, NO. C10142-2
HONORABLE DEE A. HAWTHORNE, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***


**ELIZABETH A. PICKETT
JUDGE**

**\*\*\*\*\*\*\*\*\*\***


Court composed of Glenn B. Gremillion, Elizabeth A. Pickett, and J. David Painter, Judges.

**CONVICTION REVERSED AND SET ASIDE.**


**Van Hardin Kyzar
District Attorney, 10th JDC
P. O. Box 838
Natchitoches, LA 71458-0838
(318) 357-2214
Counsel for Appellee:
State of Louisiana**

**Edward Kelly Bauman
Louisiana Appellate Project
P. O. Box 1641
Lake Charles, LA 70602-1641
(337) 491-0570
Counsel for Defendant-Appellant:
Kimberly M. Scallion**

**PICKETT, Judge.**

On or about August 3, 2005, at approximately 3:30 p.m., Charles Donald Turnage, III, a state trooper assigned to Troop E in Alexandria, was advised by his supervisor, Sergeant J. D. Aliphant, that their office had been contacted by a narcotics officer with Louisiana State Police Troop G in Shreveport. According to the Shreveport officers, Kevin Bounds had been stopped for a traffic violation in Homer, Louisiana. Mr. Bounds had in his possession sixty Sudafed tablets and other precursors used to cook methamphetamine. According to Mr. Bounds, he was supposed to deliver these items to Eddie Wayne Scallion and in return he would receive the finished product (methamphetamine) as payment. Mr. Bounds told the troopers he had prior transactions with Kenneth Scallion and had been present when Kenneth Scallion was cooking methamphetamine. Trooper Turnage was advised that Mr. Bounds was willing to cooperate in making a controlled delivery of these items to the Scallion residence.

The agents from Troop E, including Trooper Turnage and Sgt. Aliphant, met with the agents from Troop G and Mr. Bounds in DeSoto Parish, Louisiana. It was decided that Mr. Bounds and Trooper Jason Parker, acting in an undercover capacity, would make a controlled delivery of the Sudafed and precursors to the Scallion residence. Trooper Parker was wired with an audio listening device such that the other officers could hear what was being said. Mr. Bounds was not wired with an audio listening device. The group traveled from DeSoto Parish to the staging area, a church parking lot a few miles from the Scallion residence. Mr. Bounds attempted to contact Eddie Wayne Scallion by telephone but was unsuccessful. Although Mr. Bounds was told that Eddie Wayne Scallion was not home, he told the officers that

1

he in fact believed Mr. Scallion was home because he was expecting Mr. Bounds, and in the past he had been told Mr. Scallion wasn't home when in fact he was.

Mr. Bounds and Trooper Parker proceeded to the Scallion residence in Mr. Bounds' vehicle. Mr. Bounds went into the Scallion residence. Trooper Parker never entered the residence. The two subsequently met up with Trooper Turnage at the church. According to Mr. Bounds, delivery of the Sudafed was made to Eddie Wayne Scallion. Although he was supposed to have delivered two precursors, for reasons that are unexplained in the record, the precursors were left in the vehicle and never delivered by Mr. Bounds to the residence. According to Mr. Bounds, he was told to come back in a few hours to pick up the finished product as payment for the Sudafed tablets. Because Trooper Parker, who was wearing the wire, did not go into the residence, there is no corroborating evidence of this conversation. Mr. Bounds also told the officers that while he was in the residence he observed what he believed to be pill wash in Mason jars in one of the bedrooms. Pill wash was described as a white substance created by adding certain chemicals to Sudafed to break down the Sudafed and prepare it for the cooking process.

A discussion was held between the troopers at the staging area. Trooper Turnage testified at the suppression hearing that this group included Trooper Turnage, Sgt. Aliphant, Trooper Jay Perry, Officer Greg Dunn of the Natchitoches Parish Drug Task Force, and several other agents. According to Trooper Turnage, Trooper Perry was of the opinion that if there was already pill wash at the Scallion residence, it would not be long before a hazardous situation existed in the cooking process. Ultimately it was decided that rather than risk entering the residence in the middle of a "cook," they would conduct a 'knock and talk' and interrupt the cooking process. Trooper Turnage testified that Officer Dunn contacted the Natchitoches

2

Parish Sheriff's Office and asked for a marked unit to accompany Trooper Turnage to the residence.

Officer Dunn testified at the suppression hearing. According to Officer Dunn, he was contacted by Sgt. Aliphant and asked to assist in this investigation. He and another officer met the troopers at the church where they were staging at the intersection of La.Hwy. 9 and La.Hwy. 2153. He testified that it took approximately fifteen to eighteen minutes to drive from Natchitoches to that location. According to Officer Dunn, they were notified upon arriving at the church that they were going to the Scallion residence. Officer Dunn testified that the decision to go to the house had been made before he arrived at the scene. He testified that:

> by the time we got our vests and stuff thrown on, they said let's ride. We jumped in the vehicle. As we was driving down the road they said they were going to this house, we'll take the back door. They had already assigned the people to the front. Everybody had been assigned their jobs. Myself and Sergeant Henson were the last two people to arrive. And everything moved quickly.

This clearly contradicts Trooper Turnage's testimony that Officer Dunn was in the area when the controlled delivery was made and that Officer Dunn was present when a 'plan of action' was discussed.

Trooper Turnage testified that he, along with other officers, approached the house to do the 'knock and talk' at approximately 11:40 p.m. They knocked on the door, announced they were the police, and could see two silhouettes through the door. The texture of the glass in the door prevented him from determining who the people were or what they were doing. He testified that instead of coming to the door, however, they started moving back and forth through the house quickly, in what he described as a 'panic type' movement. Trooper Turnage further testified that, as he was unsure of what was going on in the house, whether the individuals were arming

3

themselves or destroying evidence, he and the other officers forced entry into the house at that time.

Four individuals were in the home and were identified as Eddie Wayne Scallion, Todd Smith, Edward Marion Scallion, and the defendant herein, Kimberly Scallion. The officers entered each and every room in the house, secured the above named individuals, handcuffed them, and brought them all into the living room and sat them on the couch and the chair.

After entering the Scallion residence, the officers saw, in the process of securing the premises, several Mason jars containing a white substance mixed with a liquid substance, several open bottles of Heet, several open bottles of hydrogen peroxide, used coffee filters with a white substance on them, and an open bottle of Red Devil lye. All these substances, according to Trooper Turnage, are used in manufacturing methamphetamine.

Trooper Turnage testified that, subsequently, he, Sgt. Aliphant, Officer Dunn, and Richard Horton typed up a search warrant on his laptop computer and called the judge. Specifically, although Trooper Turnage signed as affiant on the affidavit ultimately filed in the record, Officer Dunn called the judge. This phone call took place at approximately 11:50 p.m.

Officer Dunn testified that he was approached by Trooper Turnage and asked if he knew how to get in touch with any one of the judges. He responded affirmatively and called the judge at her residence. Officer Dunn testified that he was not with Trooper Turnage when he sat down and wrote or typed up the affidavit. He never actually saw the affidavit until a day or so after the search. Officer Dunn stated that Trooper Turnage relayed information to him, and he relayed it to the judge over the telephone. Officer Dunn specifically testified that Trooper Turnage "had facts

4

of the case that I didn't know because it was not my case. I was just relaying the info." The judge asked Officer Dunn a few questions. The record is, however, silent as to what the questions were. Officer Dunn testified that the affidavit ultimately submitted to the judge and filed in this record was not completed when he called her. Trooper Turnage testified that Officer Dunn read the affidavit over the phone. Neither Officer Dunn nor Trooper Turnage were sworn prior to giving the judge the information. Trooper Turnage never spoke to the judge although he was the affiant. The judge gave verbal consent to conduct the search to Officer Dunn over the phone with instructions to bring the paperwork to her office early the next morning to be signed. There is nothing in the record to establish that a search warrant was prepared at the time Officer Dunn called the judge or that a search warrant was read to her over the phone. Trooper Turnage testified that he believed he had a valid search warrant that allowed him to search the residence, the curtilage of the residence, and any vehicles and allowed him to search for narcotics and paraphernalia. The record, however, is void of any testimony that the search warrant or any of the information contained in the search warrant was ever either relayed to or read to the judge. The record reflects testimony from the officers that the judge gave them verbal permission to search the residence, but there is no evidence that the residence she authorized them to search was described with any particularity or that any parameters for the search were established. Officer Dunn's direct testimony was that he did not see 'the document,' meaning the affidavit, that night. There is no testimony as to the existence of the search warrant that night.

Pursuant to the judge's verbal authorization, the residence was searched and a number of items seized. Later that morning, Trooper Turnage took a prepared affidavit and search warrant to the judge's office where they were signed.

5

The defendant , Kimberly M. Scallion, was charged by bill of information filed on May 23, 2006, with one count of possession of diphenoxylate with intent to distribute, in violation of La.R.S. 40:970, and one count of possession of oxycodone, in violation of La.R.S. 40:967. The defendant entered a plea of not guilty to all charges on May 24, 2006. A motion to suppress evidence was filed on November 3, 2006. The trial court held a suppression hearing on January 30, 2007. The motion was denied, with written reasons, on April 13, 2007.

On April 30, 2007, the defendant entered a guilty plea, pursuant to *State v. Crosby,* 338 So.2d 584 (La.1976), to possession of oxycodone, and reserved her right to appeal the trial court's denial of her motion to suppress. The remaining charge was dismissed. The defendant was subsequently sentenced to serve five years at hard labor, all of which were suspended, and she was placed on five years supervised probation. The defendant was further ordered to pay certain fines and costs.

The defendant timely filed a motion for appeal. The defendant is now before this court asserting one assignment of error, wherein she contends the trial court erred in denying her motion to suppress.

### DISCUSSION

In her sole assignment of error, the defendant argues the trial court erred in failing to grant her Motion to Suppress Evidence.

The Fourth Amendment of the U.S. Constitution prohibits unreasonable searches and unreasonable seizures of items located in a person's home. Further, Article 1, Section 5 of the Louisiana Constitution of 1974 provides as follows:

§5. Right to Privacy

Section 5. Every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable

searches, seizures, or invasions of privacy. No warrant shall issue without probable cause supported by oath or affirmation, and particularly describing the place to be searched, the persons or things to be seized, and the lawful purpose or reason for the search. Any person adversely affected by a search or seizure conducted in violation of this Section shall have standing to raise its illegality in the appropriate court.

## *WARRANTLESS ENTRY INTO THE HOME*

There is no question that the initial entry into the Scallion residence was without a warrant. The officers involved in this investigation decided to approach the residence at issue and conduct a 'knock and talk.' 'Knock and talk' is a law enforcement tactic where police officers, who possess some information that they believe warrants further investigation but is insufficient to constitute probable cause for a search warrant, approach the person suspected of engaging in illegal activity at the person's residence, knock on the front door, identify themselves as police officers, and request consent to search for the suspected illegality or illicit items. *State v. Warren*, 05-2248 (La. 2/22/07), 949 So.2d 1215.

Louisiana jurisprudence allows the 'knock and talk' approach of police. See *State v. Green*, 598 So.2d 624 (La.App. 3 Cir. 1992). Knocking on a person's door violates no right of privacy. *State v. Sanders*, 374 So.2d 1186 (La.1979). Knocking on one's door is "an age old request for permission to speak to the occupant." *Id.* at 1188. We find, therefore, no impropriety in the officers knocking at the door of the Scallion residence.

We now must determine whether the officers were justified in the forced entry into the Scallion home. When the officers knocked on the door, the occupants of the house began to move back and forth quickly within the residence. The state maintains that because of this, and because the officers did not know whether the

7

occupants were arming themselves or destroying evidence, exigent circumstances existed that justified the warrantless, forced entry into the home.

Searches and seizures inside a residence without a warrant are presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371 (1980). There are exceptions to the warrant requirement, one being that exigent circumstances exist that justify the warrantless entry. *Id.* The Louisiana Supreme Court recently discussed the exigent circumstance exception, noting as follows:

> Police generally need a warrant to enter a home, but "warrantless searches will be allowed when police have a reasonable belief that exigent circumstances require immediate action and there is no time to secure a warrant." *United States v. Lenoir*, 318 F.3d 725, 730 (7th Cir.2003); *United States v. Marshall*, 157 F.3d 477, 481-82 (7th Cir.1998); *United States v. Radka*, 904 F.2d 357, 361 (6th Cir.1990). . . . .To justify a warrantless entry, the exigent circumstances must be known to the officers "at the time of the warrantless entry" and cannot be based on evidence discovered during the search. *United States v. Rivera*, 248 F.3d 677, 680-81 (7th Cir.), *cert. denied*, 534 U.S. 923, 122 S.Ct. 277, 151 L.Ed.2d 203 (2001); accord *United States v. Arch*, 7 F.3d 1300, 1304 (7th Cir.1993).

> In order to justify a warrantless entry based on exigent circumstances, there must also be probable cause to enter the residence. *United States v. Johnson*, 9 F.3d 506, 509 (6th Cir.1993) (*citing United States v. Sangineto-Miranda*, 859 F.2d 1501, 1511 n. 6 (6th Cir.1988)); *Steagald v. United States*, 451 U.S. 204, 211, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981); *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *see also United States v. Rubin*, 474 F.2d 262, 268 (3d Cir.1973) []. Probable cause is defined as "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir.1990). This determination must be made from the totality of the circumstances, based on the objective facts known to the officer at the time. *United States v. Ferguson*, 8 F.3d 385, 391-92 (6th Cir.1993). In determining whether sufficient exigent circumstances exist to justify the warrantless entry and search or seizure, the court must "consider the totality of the circumstances and the 'inherent necessities of the situation at the time.'" [*United States v.*] *Rohrig*, 98 F.3d 1506 at 1511 [(6th Cir. 1996)] (*quoting Johnson*, 9 F.3d at 508) (internal quotation marks omitted). Further, the scope of the intrusion must be circumscribed by the exigencies that justified the warrantless search. *Mincey v. Arizona*, [437 U.S. 385, 394, 98 S.Ct. 2408,(1978)].

In *U.S. v. Coles*, 437 F.3d 361(3rd Cir.2006), the Federal United States Appellate Court noted examples of exigent circumstances that included, but were not limited to hot pursuit of a suspected felon, the possibility that evidence may be removed or destroyed, and danger to the lives of officers or others. United States v. Rohrig, 98 F.3d 1506, 1515 (6th Cir.1996); *U.S. v. Richard*, 994 F.2d 244, 247-48 (5th Cir.1993); *Mincey v. Arizona*, 437 U.S. 385, 394, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *see also Rubin*, 474 F.2d at 268-69. In these limited situations, the need for effective law enforcement trumps the right of privacy and the requirement of a search warrant, thereby excusing an otherwise unconstitutional intrusion. *Warden v. Hayden*, 387 U.S. 294, 298-99, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). Exigent circumstances, however, do not meet Fourth Amendment standards if the government deliberately creates them. *United States v. Acosta*, 965 F.2d 1248, 1254(3d Cir.1992); *United States v. Duchi*, 906 F.2d 1278, 1284-85 (8th Cir.1990); *United States v. Timberlake*, 896 F.2d 592, 597 (D.C.Cir.1990); *United States v. Thompson*, 700 F.2d 944, 950 (5th Cir.1983).

. . . .

Exigent circumstances justify a warrantless entry, search, or seizure when "police officers, acting on probable cause and in good faith, reasonably believe from the totality of the circumstances that (a) evidence or contraband will imminently be destroyed or (b) the nature of the crime or character of the suspect(s) pose a risk of danger to the arresting officers or third persons." *United States v. Kunkler*, 679 F.2d 187, 191-192 (9th Cir.1982) (footnote omitted ). The government bears the burden of showing specific and articulable facts to justify the finding of exigent circumstances. *LaLonde v. County of Riverside*, 204 F.3d 947, 957 (9th Cir.2000) (*citing United States v. Shephard*, 21 F.3d 933, 938 (9th Cir.1994)) (*quoting United States v. Driver*, 776 F.2d 807, 810 (9th Cir.1985)).

*Warren*, 949 So.2d at 1224-1225.

We must examine the facts known to law enforcement at the time the officers knocked on the door at the Scallion residence to determine whether, under the totality of the circumstances and acting on probable cause, the officers reasonably believed that evidence was at risk of being immediately destroyed or there was a risk of danger to the officers.

At the time of the 'knock and talk,' the officers had information from Mr. Bounds that he was supposed to deliver Sudafed and precursors used in the manufacturing of methamphetamine to Eddie Wayne Scallion in Natchitoches Parish. Mr. Bounds had been stopped for a traffic violation in Homer, Louisiana, and these items were found in his possession. The officers had no previous knowledge of Mr. Bounds. They knew nothing of his background and, not only had the police never used him in the past as an informant, they had never had any contact with him until that day. Based on the information he gave them, they targeted the Scallion residence as the possible location of a methamphetamine lab. Although an officer accompanied Mr. Bounds to the Scallion residence, only Mr. Bounds actually went inside the house. Only the Sudafed was taken into the residence. The precursors were not. The law enforcement officers had no prior knowledge of any drug-related activities at the Scallion residence. Mr. Bounds told them who was in the house. Mr. Bounds told them that he had seen pill wash in one of the bedrooms. Mr. Bounds told them that he was to be back in a few hours to receive the finished product. All the information the officers had available to them came from Mr. Bounds with whom they first had contact less than nine hours earlier during a traffic stop. They had no information that would establish Mr. Bounds as a reliable informant. They had no prior knowledge of drug activity at the Scallion residence. They had no corroborating information from any other source. The only objective fact known to law enforcement was that Mr. Bounds dropped sixty Sudafed tablets at the Scallion residence. Any other information the police had was the product of the uncorroborated statements of Mr. Bounds.

In *State v. Killian*, 95-826 (La.App. 3 Cir. 5/8/96), 677 So. 2d 487, *writ denied*, 96-1461 (La. 11/8/96), 683 So.2d 266, this court upheld the validity of a warrantless entry into a home where the police officers could see into the residence and observe both drugs in plain view and the panicked movement of the occupants. In the instant case, Trooper Turnage could not see into the Scallion residence because of the texture of the glass. The officers could only see the forms of individuals moving back and forth in what was described as panicked movements. Based on the totality of the actual information available to them at that time, we do not find that law enforcement officers could reasonably conclude that the reason for the movement was the destruction of evidence or arming of the occupants. Because we find the officers lacked probable cause to believe the destruction of evidence was imminent, or their safety was at risk, we find there were no exigent circumstances that justified the forced entry into the Scallion residence. Any evidence discovered by law enforcement as a result of the warrantless entry, therefore, cannot be considered in determining whether there was probable cause for a search warrant to be issued and cannot be admitted into evidence under the 'plain view' doctrine.

## SEARCH WARRANT

The law enforcement officers contacted the judge by telephone and sought to obtain a telephonic search warrant. Trooper Turnage testified that he believed he had a valid search warrant. The trial court, in its reasons for ruling, found the officers to be in good faith and refused to suppress the evidence seized pursuant to the warrant, relying on *State v. Guidry,* 03-625 (La. App. 5 Cir. 1/27/04), 866 So.2d 944 and *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405 (1984). We disagree that the exceptions set forth in *Leon* and *Guidry* apply to the matter before us.

11

The officers sought to obtain a telephonic search warrant. Telephonic search warrants are authorized in Louisiana pursuant to La.Code Crim.P. art. 162.1, which provides in pertinent part as follows:

> A. In addition to the provisions of Article 162, a search warrant may issue only upon probable cause established to the satisfaction of the judge by the sworn oral testimony of a credible person reciting facts establishing the cause for issuance of the warrant.

> B. The sworn oral testimony may be communicated to the judge, and the oath may be administered by the judge, by telephone, radio, or such other electronic method of communication deemed appropriate by the judge. If the judge determines that the warrant should issue, he shall order the applicant to affix a facsimile of his signature to the warrant which the applicant has prepared and to note thereon the date and time of the determination. The sworn oral testimony, the contents of the warrant issued, the order to affix the signature facsimile, and the date and time of the determination shall be electronically recorded by the judge, who shall cause the recording to be transcribed and fixed in the record within seven days. The judge shall certify the accuracy of the transcription.

> C. A search warrant shall particularly describe the person or place to be searched, the persons or things to be seized, and the lawful purpose or reason for the search or seizure.

In *Leon*, 468 U.S. 897, a facially valid search warrant was issued by a state court judge. Certain evidence was seized pursuant to that warrant, and ultimately the defendants were indicted on several criminal counts based on the evidence seized. At a subsequent suppression hearing, the evidence was suppressed. The trial court concluded that the affidavit was insufficient to support the issuance of the warrant. The Court of Appeal affirmed the trial court's ruling. *United States v. Leon*, 701 F.2d 187 (1983). The Supreme Court ultimately held that the Fourth Amendment exclusionary rule should not be applied to suppress the use of evidence in the prosecution of a defendant where the police obtained the evidence pursuant to a search warrant issued by a neutral magistrate where the warrant is ultimately found

12

to be invalid. *Leon*, 468 U.S. 897. The Supreme Court in *Leon* noted that the purpose of the exclusionary rule is "to deter police misconduct rather than to punish the errors of judges and magistrates." *Id.* at 916. The Court declined to exclude evidence seized pursuant to a warrant executed by an officer who acted in good faith under the belief he had a valid warrant and who acted within its scope. The court specified four situations, however, where the suppression of evidence would be appropriate: (1) If the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) The issuing magistrate wholly abandons his detached and neutral judicial role; (3) When the warrant is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) When a warrant is so facially deficient – i.e., in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid.

In *Guidry*, 866 So. 2d 944, the court, upon remand from the Louisiana Supreme Court, addressed the issue of whether evidence must be suppressed when the mandatory provisions of La.Code Crim.P. art. 162.1(D), pertaining to facsimile-issued search warrants, are not met. In *Guidry*, the affidavit and search warrant were faxed to the issuing judge. The officer who submitted the affidavit was not certain he signed it before it was submitted. The judge failed to certify the date and time of the administration of the oath as required by Article 162.1(D). According to the officer, the judge never administered the oath. The court found that "the executing officers reasonably presumed the warrant to be valid given the fact that the judge signed the warrant acknowledging that [the officer] presented an affidavit to him and

13

that he was satisfied probable cause existed." *Id.* at 948. Relying on the good faith exception set forth in *Leon*, the court determined that the deficiencies did not require suppression.

The facts in *Guidry* are clearly distinguishable from those before us in this matter. Article 162.1 allows the affiant to read the affidavit, under oath, to the judge by telephone or other electronic means. The statute clearly requires that the warrant also be read, which includes the required description of the place to be searched, the reason for the search, and the things to be seized, since it mandates that both the affidavit and warrant be electronically recorded by the judge. Further, the statute directs that the judge authorize a facsimile of her signature be affixed to the warrant the officer has prepared. The electronic recording, which is then transcribed within the prescribed time and filed with the clerk, assures that what was presented to the judge over the telephone, and what the judge authorized as to the search warrant, did in fact meet the requirements of law as to establishing probable cause for the issuance of the warrant and the actual contents of the warrant authorized by the court.

In the matter before us, there was total noncompliance with the mandated provisions of Article 162.1(A)(B) and (C). There is no clear evidence that either an affidavit or a warrant actually existed at the time the judge was contacted by the officers. The judge never spoke to the affiant, only to an officer relaying information to the judge from the affiant. There is no testimony that the warrant, describing the place to be searched, the things to be seized, and the lawful purpose for the search, was ever read to the judge. There is no evidence that either the affidavit or warrant had been prepared prior to the phone call to the judge. In fact, the officer who spoke to the judge, Officer Dunn, specifically testified that he was not with the affiant when

14

he sat down and wrote up the affidavit. Officer Dunn testified he never saw the affidavit until a day or so after the search and that the affidavit was not completed when he talked to the judge. As there was no electronic recording, as required by the statute, it is not possible to determine if the affidavit and warrant presented the following morning contained the same information as given over the telephone the night before.

Both Trooper Turnage and Officer Dunn testified that they believed they had a valid search warrant. Officer Dunn said that the judge gave them a 'verbal warrant.' Article 162.1 does not contemplate the issuance of a 'verbal warrant.' It clearly requires that the affidavit and warrant are prepared, read to the judge, and the contents electronically recorded. There is no evidence that either an affidavit had been prepared or that a search warrant actually existed prior to the search of the Scallion residence.

*Leon* clearly states that the suppression of evidence is appropriate when either the warrant is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence unreasonable or when a warrant is so facially deficient that the executing officers cannot reasonably presume it to be valid. As there is no evidence that either an affidavit or a warrant were actually drawn up until after the search, we find the officers could not reasonably rely on a verbal authorization from the judge. This is not a case where there was simply an error by the issuing magistrate. We find the trial court erred, therefore, in denying the defendant's motion to suppress evidence.

15

**CONCLUSION**

There were no exigent circumstances that justified the warrantless entry into the Scallion residence. Further, considering the totality of the evidence presented, there was no facially valid warrant upon which law enforcement could reasonably rely in conducting the search of the Scallion residence. The trial court's ruling on the motion to suppress is reversed. The defendant's conviction is reversed and set aside.

**CONVICTION REVERSED AND SET ASIDE.**