17 F.3d 399
 305 U.S.App.D.C. 83
EFRAIN
UNITED STATES of America, Appellee,
v.
Andre DAWKINS, Appellant.
 No. 91-3247.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 28, 1994.
Decided March 11, 1994.
 
 Appeal from the United States District Court for the District of Columbia (Criminal No. 89-00482-01).
 Robert S. Becker, Washington, D.C. (appointed by the Court), argued the cause and filed the briefs, for appellant.
 Catherine C. Pisaturo, Asst. U.S. Atty., argued the cause for appellee. With her on the brief were J. Ramsey Johnson, U.S. Atty., John R. Fisher and William M. Blier, Asst. U.S. Attys.
 Before WALD, HENDERSON and RANDOLPH, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WALD.
 WALD, Circuit Judge:
 
 
 1
 Andre Dawkins appeals his convictions for unlawful possession with intent to distribute a detectable amount of cocaine base in violation of21 U.S.C. Sec. 841(a)(1), using and carrying a firearm during and in relation to a drug trafficking offense in violation of 18 U.S.C. Sec. 924(c), and unlawful possession of an unregistered firearm in violation of 26 U.S.C. Sec. 5861(d). Dawkins contends principally that the trial court erroneously refused to suppress evidence obtained during a warrantless search of his apartment. Because we agree that the circumstances in this case did not bring the entry and sweep of Dawkins' apartment within existing exceptions to the warrant requirement, we reverse.
 
 I.
 
 2
 The material facts in this case are not in dispute. On the afternoon of November 12, 1989, the police received a call from a woman who volunteered information that Andre Dawkins, whom she indicated was an escapee from a juvenile detention facility, had drugs and guns in his residence at 1902 Savannah Terrace, S.E., Apartment 104. The woman identified herself as Katrina McEachin, a former girlfriend of Dawkins, and stated that she had observed the contraband first-hand. McEachin gave the police a detailed description of Dawkins, including a scar on his head and a scar or dog bite on his leg. She indicated that the police could find Dawkins at 2000 Savannah Terrace, S.E., Apartment 301. Uniformed officers went to Apartment 301, but received no response to their knocks. The officers left the premises.
 
 
 3
 Minutes later, McEachin called the police again, informing them that Dawkins had just contacted her and threatened to kill her for making the initial call to the police. McEachin told the police that she knew Dawkins was still in Apartment 301, because she had called him there after his threat and he had answered the phone. Several uniformed officers returned to Apartment 301. Detectives Curley and Zattau joined them shortly thereafter, after confirming that Dawkins had in fact escaped from a juvenile detention facility.[1] An occupant of Apartment 301 claiming to be "James Boyd" fit the general description provided by McEachin. The police detected a scar on his head, but were unable to locate a scar or dog bite on his leg.[2] After a few moments, Detective Zattau left the apartment to call McEachin, who was at her home, to determine whether Dawkins had a key to Apartment 104. She indicated that he did. Detective Zattau then reentered the apartment and asked "Boyd" to reveal the contents of his pockets. "Boyd" pulled out some money and a key. He had no identification. Upon questioning, "Boyd" claimed that he had found the key in front of the apartment, and he gave Detective Zattau permission to keep it. An older man, who identified himself as "Mr. Boyd," arrived at Apartment 301 and identified the younger man as "James Boyd," his son, who resided in Apartment 301.
 
 
 4
 Detectives Zattau and Curley and two uniformed officers left Apartment 301 and proceeded to Apartment 104, which was a little more than 100 yards away.[3] Other officers remained at Apartment 301 for a brief period before leaving. At Apartment 104, the police knocked on the door and stated their purpose. They received no response and could not hear any sounds emanating from the apartment. Detective Zattau inserted the key taken from "Boyd" into the lock. It fit. The police unlocked and opened the door, again announced their presence, and again received no response. All four officers then entered the apartment and walked through it for two minutes, inspecting the premises for the professed purpose of determining whether Dawkins was there or whether any other person was present who might destroy evidence. See Motions Transcript ("Tr.") at 16, 23. The police did not open any interior doors or drawers. In the back bedroom, two officers observed the butt of a magnum-type revolver and the frame of what appeared to be a 9mm handgun on a shelf in an open closet, where McEachin had said they would be found. The police also found a photograph of the man they had questioned in Apartment 301. They radioed fellow officers to arrest Andre Dawkins, alias "James Boyd," for threatening Katrina McEachin. Dawkins was subsequently arrested on the street outside Apartment 301.
 
 
 5
 Two uniformed officers remained on site at Apartment 104 to secure the apartment, while the others left to get a search warrant. The affidavit supporting the warrant described both McEachin's tip and the corroborating evidence observed during the sweep of Apartment 104. The police executed the warrant the next day. The search proved fruitful, uncovering a 12-gauge sawed-off shotgun, a .357 magnum revolver, a broken 9mm semiautomatic pistol, a .38 caliber handgun, a shoulder holster for the .357 revolver, and an abundance of ammunition for all four of the weapons. In addition, officers seized a candy tin that housed numerous small ziplock bags containing 3.55 grams of crack cocaine. Police also recovered photographs of Dawkins and McEachin, men's clothing, and a receipt for a rug in the name of "Boyd" from several weeks before.
 
 
 6
 The trial judge denied Dawkins' motion to suppress evidence seized in Apartment 104 after a hearing on July 13, 1990. Describing what had transpired as "a very unique escalating situation," Tr. 65, the judge found that the police had entered Apartment 104 reasonably under exigent circumstances. The judge placed special emphasis on the officers' obligation to identify and subdue Dawkins, given the alleged threats against McEachin's life. At the subsequent trial, at which the challenged evidence taken from Apartment 104 was admitted, the jury convicted Dawkins on all counts. Dawkins filed this timely appeal.
 
 II.
 
 7
 It is a "basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980) (citing Coolidge v. New Hampshire, 403 U.S. 443, 474, 91 S.Ct. 2022, 2042, 29 L.Ed.2d 564 (1971)).[4] When an individual's right to privacy in his home "must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent." Johnson v. United States, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948); see also Dorman v. United States, 435 F.2d 385, 389 (D.C.Cir.1970). In the clearest of terms, "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." Payton, 445 U.S. at 590, 100 S.Ct. at 1382; see also Welsh v. Wisconsin, 466 U.S. 740, 750, 104 S.Ct. 2091, 2098, 80 L.Ed.2d 732 (1984); Steagald v. United States, 451 U.S. 204, 212, 101 S.Ct. 1642, 1647, 68 L.Ed.2d 38 (1981); Vale v. Louisiana, 399 U.S. 30, 34, 90 S.Ct. 1969, 1972, 26 L.Ed.2d 409 (1970); United States v. Socey, 846 F.2d 1439, 1444 (D.C.Cir.), cert. denied, 488 U.S. 858, 109 S.Ct. 152, 102 L.Ed.2d 123 (1988).
 
 
 8
 The government has to surmount two hurdles in order to justify its warrantless search of Apartment 104. First, it must demonstrate the requisite level of suspicion to enter and/or sweep the residence. All searches of the home, whether by warrant or pursuant to a recognized exception, must be supported by some form of probable cause. See Arizona v. Hicks, 480 U.S. 321, 327-28, 107 S.Ct. 1149, 1153-54, 94 L.Ed.2d 347 (1987); Socey, 846 F.2d at 1444 n. 5; see also United States v. Johnson, 9 F.3d 506, 509 (6th Cir.1993); United States v. Howard, 828 F.2d 552, 555 (9th Cir.1987); United States v. Cresta, 825 F.2d 538, 553 (1st Cir.1987), cert. denied, 486 U.S. 1042, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988). This requirement stems from the fact that an exception to the warrant preference rule excuses the government only from the necessity of going before a magistrate; it does not alter the underlying level of cause necessary to support entry. Second, the government must demonstrate that its failure to procure a warrant was justifiable in light of circumstantial exigencies. See Welsh, 466 U.S. at 750, 104 S.Ct. at 2098; United States v. United States District Court, 407 U.S. 297, 318, 92 S.Ct. 2125, 2137, 32 L.Ed.2d 752 (1972). The government urges in this case that ample corroboration of McEachin's tip provided probable cause to enter Apartment 104 and that the need to find Dawkins and to secure destructible evidence justified the officers' warrantless sweep. We address these contentions in turn.
 
 A. Probable Cause
 
 9
 The government relies on "a unique combination of circumstances"--Dawkins' status as a fugitive, the fact that he had allegedly threatened McEachin, and the likelihood that destructible or dangerous evidence would be found within the apartment--in support of its claim that exigent circumstances excused the officers' warrantless entry. See Appellee's Brief at 22. For purposes of the underlying probable cause determination, these contentions require two different inquiries. The necessity of entering Dawkins' apartment to find him turns on the existence of probable cause to arrest Dawkins.[5] See Payton v. New York, 445 U.S. 573, 603, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639 (1980). Probable cause to arrest requires the existence of "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person ... in believing ... that the suspect has committed, is committing, or is about to commit an offense." Michigan v. DeFillippo, 443 U.S. 31, 37, 99 S.Ct. 2627, 2632, 61 L.Ed.2d 343 (1979). The need to preserve evidence against destruction by Dawkins or any possible confederates or to secure potentially dangerous evidence hinges on probable cause to believe that such evidence actually could be found inside Apartment 104. See United States v. Socey, 846 F.2d 1439, 1444 n. 5 (D.C.Cir.), cert. denied, 488 U.S. 858, 109 S.Ct. 152, 102 L.Ed.2d 123 (1988); see also United States v. Vaughn, 830 F.2d 1185, 1187 (D.C.Cir.1987).
 
 
 10
 Although probable cause to arrest and probable cause to search have different emphases, the Supreme Court has set forth general principles that guide our approach to either inquiry. See Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (elaborating standard for probable cause to search); see also United States v. Lincoln, 992 F.2d 356, 358 (D.C.Cir.1992) (applying same analysis to probable cause to arrest). Rejecting the mechanistic formulae that had obtained in prior cases, the Gates Court embraced a totality of the circumstances approach to probable cause that places emphasis on "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Gates, 462 U.S. at 231, 103 S.Ct. at 2328 (quoting Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949)). Where an informant's tips are concerned, the task turns in large part on independent police work corroborating the details of the informant's charge. See United States v. Laws, 808 F.2d 92, 97 (D.C.Cir.1986). In some circumstances, it may be enough that law enforcement officers confirm the tip's innocent details, for "seemingly innocent activity [may become] suspicious in light of the initial tip." Gates, 462 U.S. at 243 n. 13, 103 S.Ct. at 2335 n. 13 (citation omitted). Moreover, as the Court made clear, tips need not be infallible; small inaccuracies will not undermine the probative value of the information as a whole if other indicia of reliability are present. See id. at 245 n. 14, 103 S.Ct. at 2336 n. 14.
 
 
 11
 Our review of the totality of circumstances surrounding government action in this case convinces us that the police had probable cause both to arrest Dawkins (whether for fleeing the detention facility or for threatening McEachin) and to believe that there were guns and drugs in Apartment 104. As an initial matter, Detectives Zattau and Curley confirmed via computer McEachin's tip that Dawkins had escaped from a juvenile detention facility. See Tr. at 8. They thus had abundant reason to believe that Dawkins was a fugitive. But beyond this, the police had considerable cause to believe the substance of McEachin's other allegations. McEachin was privy to the confidential information that Dawkins had escaped from a juvenile detention facility. This information was "of a character likely obtained only from [Dawkins himself], or from someone familiar with [Dawkins' situation]." Gates, 462 U.S. at 245, 103 S.Ct. at 2336; see also United States v. Laws, 808 F.2d 92, 98 (D.C.Cir.1986). McEachin identified herself and her relationship with Dawkins and claimed to have seen the drugs and guns first-hand.[6] She provided highly specific information describing Dawkins and his whereabouts, which was confirmed by the police when they found a young man fitting Dawkins' general description--including a scar on his head but without a visible scar or dog bite on his leg--in Apartment 301. Her information was further corroborated when the key taken from "Boyd" fit the lock at Apartment 104. Applying the "flexible, common-sense standard" set forth in Gates, 462 U.S. at 239, 103 S.Ct. at 2332, we see no reason to question the existence of probable cause to arrest or to search in this case.[7]
 
 B. Exigent Circumstances
 
 12
 The existence of a surfeit of probable cause, it is clear, does not in itself immunize the officers' conduct. Indeed, "a search or seizure carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances.' " Coolidge v. New Hampshire, 403 U.S. 443, 474-75, 91 S.Ct. 2022, 2041-42, 29 L.Ed.2d 564 (1971); see also United States v. Timberlake, 896 F.2d 592, 596 (D.C.Cir.1990). As we noted in Dorman v. United States, 435 F.2d 385 (D.C.Cir.1970), "[t]erms like 'exigent circumstances' or 'urgent need' are useful in underscoring the heavy burden on the police to show that there was a need that could not brook the delay incident to obtaining a warrant...." Id. at 392.
 
 
 13
 Because the possible factual permutations are almost endless, courts have not spelled out a definition of "exigency" with any precision. In Dorman, this court enumerated several nonexclusive considerations pertinent to a finding of exigency, including gravity of the offense, reason to believe the suspect is armed and on the premises, and likelihood that the suspect may escape if not swiftly apprehended. See 435 F.2d at 392-93. Courts have recognized emergencies excusing failure to procure a warrant very sparingly. See, e.g., United States v. Santana, 427 U.S. 38, 42-43, 96 S.Ct. 2406, 2409-10, 49 L.Ed.2d 300 (1976) (hot pursuit of fleeing felon); Cupp v. Murphy, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973) (evanescent evidence); Warden v. Hayden, 387 U.S. 294, 298-99, 87 S.Ct. 1642, 1645-46, 18 L.Ed.2d 782 (1967) (hot pursuit of armed and dangerous felon); United States v. Mason, 966 F.2d 1488, 1492 (D.C.Cir.) (crime in progress), cert. denied, --- U.S. ----, 113 S.Ct. 829, 121 L.Ed.2d 699 (1992); United States v. Socey, 846 F.2d 1439 (D.C.Cir.) (evidence in imminent danger of destruction), cert. denied, 488 U.S. 858, 109 S.Ct. 152, 102 L.Ed.2d 123 (1988); United States v. Riccio, 726 F.2d 638 (10th Cir.1984) (person in need of emergency assistance). In this case, the government relies partially on the need to secure destructible or dangerous evidence within Apartment 104 and partially on the necessity of arresting Dawkins in order to protect Katrina McEachin. For the sake of clarity, we evaluate each of these claims of exigency separately.
 
 1. Securing Evidence
 
 14
 We have long recognized that the imminent destruction of evidence may constitute an exigency excusing the failure to procure a warrant. See, e.g., United States v. Socey, 846 F.2d 1439, 1444 (D.C.Cir.), cert. denied, 488 U.S. 858, 109 S.Ct. 152, 102 L.Ed.2d 123 (1988); United States v. Johnson, 802 F.2d 1459, 1462 (D.C.Cir.1986); United States v. McEachin, 670 F.2d 1139, 1144 (D.C.Cir.1981); United States v. Allison, 639 F.2d 792, 794 (D.C.Cir.1980). This risk is particularly weighty where narcotics are involved, for it is "commonly known that narcotics can be easily and quickly destroyed." Johnson, 802 F.2d at 1462. Nonetheless, we have also held that "the police must have an objectively reasonable basis for concluding that the destruction of evidence is imminent." Socey, 846 F.2d at 1446; United States v. Timberlake, 896 F.2d 592, 596 (D.C.Cir.1990). In Socey, we evaluated a claim that the arrest of one defendant outside the premises created a risk that evidence of narcotics would be destroyed by his confederates inside. We held that "a police officer can show an objectively reasonable belief that contraband is being, or will be, destroyed within a home if he can show 1) a reasonable belief that third persons are inside a private dwelling and 2) a reasonable belief that these third persons are aware of an investigatory stop or arrest of a confederate outside the premises, so that they might see a need to destroy evidence." 846 F.2d at 1445.
 
 
 15
 Using the approach suggested in Socey, we find that the destruction of evidence contention in this case must be analyzed from two different angles. First, the police could try to justify their conduct on the grounds that Dawkins' comrades in the narcotics trade may have been within Apartment 104 threatening the imminent destruction of the evidence referred to by McEachin. However, this argument, premised on the Socey scenario, clearly does not give rise to a finding of exigency on the facts of this case. The police had neither information suggesting that any third party was in Apartment 104 nor evidence tending to indicate that any such (hypothetical) third party had reason to know of their initial encounter with Dawkins.
 
 
 16
 Second, police could have anticipated that Dawkins himself, alerted by his first encounter with the police, may have snuck back to Apartment 104 after the officers' initial visit to Apartment 301 in order to dispense with the evidence. However, after extensive consideration of the facts of this case, we conclude that the police could not reasonably have believed that Dawkins was in Apartment 104. McEachin's tip placed Dawkins at Apartment 301 minutes before the police arrived. "Boyd," the man police found there, fit McEachin's description in several salient respects. As McEachin predicted, he had in his pocket a key which, Detective Zattau discovered later, fit the lock at Apartment 104. At the moment the key fit the lock, it seems almost inevitable that the police officers should have known, beyond all reasonable doubt, that Dawkins and "Boyd" were one and the same, and, hence, that Dawkins could not possibly be in Apartment 104. Moreover, the fact that more than one police officer remained, however briefly, at Apartment 301 precludes any tidy inference that Dawkins/"Boyd" may have raced the hundred yards to get to Apartment 104 before the separate contingent of police arrived there. Coupled with the absence of any tell-tale sounds of destruction emanating from within Apartment 104, we cannot identify circumstances that rose to any level of exigency in this case so as to excuse the absence of a warrant. See Timberlake, 896 F.2d at 596; cf. United States v. Bonner, 874 F.2d 822, 825 (D.C.Cir.1989) (exigency exists where, inter alia, "officers heard sounds consistent with ... destruction of the object of the search"); United States v. Frierson, 299 F.2d 763 (7th Cir.1962) (exigency exists where officers heard "get rid of the stuff; get rid of the spoon").
 
 
 17
 Nor does the presence of dangerous firearms in Apartment 104 alter our disposition of this particular case. Although we have consistently credited "[t]he unique dangers presented to law officers and law-abiding citizens by firearms," United States v. Clipper, 973 F.2d 944, 950 (D.C.Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1025, 122 L.Ed.2d 171 (1993), and have commented that an exigency may be "heightened" by the presence of a deadly weapon, United States v. McEachin, 670 F.2d 1139, 1144 (D.C.Cir.1981), we have never found exigency solely on the basis that the police have information that firearms are located in a private home.[8] Rather, in the cases relied upon by the government for the proposition that the presence of guns factors into the exigency balance, the police possessed independent knowledge that the destruction of evidence was imminent or very likely--knowledge wholly lacking in this case. See, e.g., McEachin, 670 F.2d at 1144 (finding exigency where confidential informant told police that suspect was going to dispose of gun in his apartment); United States v. Allison, 639 F.2d 792, 794 (D.C.Cir.1980) (finding exigency where co-conspirator warned police of "immediate threat" that defendant would destroy the evidence); United States v. McKinney, 477 F.2d 1184, 1186 (D.C.Cir.1973) (finding exigency where sawed-off shotgun seen in "transient hotel room" of nonresident of the District).
 
 2. Arresting Dawkins
 
 18
 The government's claim that warrantless entry to arrest Dawkins was justified due to exigency rests either on "hot pursuit" grounds or on the totality of circumstances, a catch-all approach endorsed by the Supreme Court in Minnesota v. Olson, 495 U.S. 91, 100, 110 S.Ct. 1684, 1690, 109 L.Ed.2d 85 (1990).[9] Because we doubt seriously that the police could reasonably have believed that Dawkins was in Apartment 104, particularly at the point at which the key taken from "Boyd," a man whose description matched Dawkins' in virtually every respect, fit the lock, we find the requisite exigency lacking. Moreover, we note that even in the extremely unlikely event that Dawkins had been within Apartment 104, he would have posed no threat to McEachin from within the apartment. At all times relevant to the warrantless entry, of one thing the police were certain: McEachin herself was not in Apartment 104.
 
 
 19
 The "hot pursuit" exception, recognized by the Supreme Court in Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), and United States v. Santana, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), allows police officers to enter premises without a warrant when they are engaged in "some sort of a chase" and have concrete information, either by themselves observing or by hearing from contemporaneous witnesses, that the defendant has entered the building. Id. at 43, 96 S.Ct. at 2410. In United States v. Lindsay, 506 F.2d 166 (D.C.Cir.1974), this court held that "[s]peed and a continuous knowledge of the alleged perpetrator's whereabouts are the elements which underpin this exception to the warrant requirement." Id. at 173.[10] Because the police officers in this case were not chasing Dawkins in a literal sense and had no knowledge that he had entered Apartment 104--in fact, all of the evidence before them pointed to the contrary--this is clearly not a "hot pursuit" case.
 
 
 20
 Nor is the government's conduct justifiable on any broader theory of exigency. In terms of the criteria set forth in Dorman v. United States, 435 F.2d 385 (D.C.Cir.1970), which the Supreme Court recognized in Welsh v. Wisconsin, 466 U.S. 740, 751, 104 S.Ct. 2091, 2098, 80 L.Ed.2d 732 (1984), as "a leading federal case defining exigent circumstances," there was probable cause, based on reasonably trustworthy information, to believe that Dawkins had threatened to commit a grave offense against McEachin. There was also a significant likelihood, given his fugitive status, that he would escape if not swiftly apprehended. A credible case can further be made that it was reasonably likely Dawkins would be armed. However, we find it ultimately dispositive that there was absolutely no evidence, much less "strong reason," as required in Dorman, to believe that Dawkins would be at home. The Fourth Amendment admits of no exception for "conceivable" places to which dangerous suspects might flee. On a record bereft of indication that Dawkins would be in Apartment 104, we cannot sanction the officers' warrantless entry and sweep in this particular case.[11]
 
 C. Applicability of the Exclusionary Rule
 
 21
 It is axiomatic that, subject to limited exceptions, evidence seized pursuant to an unlawful search must be excluded from the government's case-in-chief. See Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); Wong Sun v. United States, 371 U.S. 471, 484, 83 S.Ct. 407, 415-16, 9 L.Ed.2d 441 (1963). It is equally clear that "[t]he exclusionary prohibition extends as well to the indirect as the direct products of such invasions." Wong Sun, 371 U.S. at 484, 83 S.Ct. at 416 (citing Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920)). The rule mandating suppression encompasses all indirectly derivative evidence, until the point at which the connection with the unlawful search becomes "so attenuated as to dissipate the taint." Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939).
 
 
 22
 The government does not attempt to fit itself within any of the recognized exceptions to this rule. It thus does not advance the argument that the evidence seen in the sweep of Apartment 104, even if initially observed in the course of an unlawful entry, might nonetheless be admissible under the independent source or inevitable discovery doctrines.[12] In light of this, we are tempted to follow the principle of waiver enunciated by the Supreme Court in Giordenello v. United States, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958), for to allow the government to benefit from such theories might "unfairly deprive [Dawkins] of an adequate opportunity to respond." Id. at 488, 78 S.Ct. at 1251. Because we believe that the issue clearly can be resolved against the government on the merits, however, we address it in the interests of judicial economy.
 
 
 23
 The affidavit supporting the government's search warrant in this case described both the substance of McEachin's tip and the evidence observed by Detectives Zattau and Curley in Apartment 104.[13] In Murray v. United States, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988), the Supreme Court stated that "[t]he ultimate question" in such circumstances "is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue here." Id. at 542, 108 S.Ct. at 2536. "This would not have been the case," the Court found, "if information obtained during the entry was presented to the Magistrate and affected his decision to issue the warrant." Id. Bearing in mind that "what counts is whether the actual illegal search had any effect in producing the warrant," id. at 542 n. 3, 108 S.Ct. 2536 n. 3, we find ourselves unable to say that it had no such effect in this case. Unlike United States v. Halliman, 923 F.2d 873 (D.C.Cir.1991), in this case we think it quite likely that the information derived from the illegal search played a large role in the magistrate's decision. Accordingly, we are constrained to suppress not only the evidence observed during the initial illegal sweep of Apartment 104, but also that evidence found the next day in the more extensive search pursuant to the search warrant.
 
 III.
 
 24
 Based on the foregoing, we hold that the district court erred in concluding that the government had satisfied its onerous burden of demonstrating urgent need for a warrantless search of Apartment 104. We find no need to address the other claims advanced by Dawkins on appeal. The conviction is reversed.
 
 
 25
 So ordered.
 
 
 
 [1]
 It is unclear whether there was an outstanding warrant for Dawkins' arrest based on his escape from the juvenile facility. The government does not press this point, conceding at oral argument that no evidence of a prior warrant was introduced into the record. Accordingly, the government does not justify its search of Apartment 104 as an entry pursuant to an arrest warrant. Cf. Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Because the government "has acquiesced in contrary findings" of the district court or "failed to raise such questions in a timely fashion during the litigation," Steagald v. United States, 451 U.S. 204, 209, 101 S.Ct. 1642, 1645, 68 L.Ed.2d 38 (1981), we deem this issue waived and presume the absence of a warrant for Dawkins' arrest
 
 
 [2]
 The record does not reveal what "Boyd" was wearing at the time or whether the officers asked him to remove any of his clothing
 
 
 [3]
 Detective Curley testified that approximately forty-five minutes elapsed between the first call by McEachin and the Detectives' arrival at Apartment 104
 
 
 [4]
 "The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter--all his force dares not cross the threshold of the ruined tenement!" Miller v. United States, 357 U.S. 301, 307, 78 S.Ct. 1190, 1195, 2 L.Ed.2d 1332 (1958) (remarks attributed to William Pitt, Earl of Chatham, during Parliamentary debate of March 1763)
 
 
 [5]
 In Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), the Supreme Court held that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Id. at 603, 100 S.Ct. at 1388; cf. Steagald v. United States, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981) (requiring a search warrant in order to effectuate an arrest warrant in the home of a third party in the absence of exigent circumstances). Because, as discussed infra, the police in this case had no reason to suspect that Dawkins would be within Apartment 104, it is problematical whether entry would have been justified even had the police possessed a warrant for Dawkins' arrest
 
 
 [6]
 Although certainly not in itself dispositive, the fact that McEachin identified herself to the police tends to make her tip more credible. As we observed in United States v. Clipper, 973 F.2d 944, 951 (D.C.Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1025, 122 L.Ed.2d 171 (1993), D.C. law punishes those who make fraudulent reports to the police. See D.C. Code Sec. 4-151 (1988)
 
 
 [7]
 Because of this conclusion, we have no need to address the government's additional argument, predicated on United States v. Anderson, 533 F.2d 1210, 1213 (D.C.Cir.1976), that McEachin's tip was deserving of special deference due to her status as a victim of Dawkins' threats. We do note, however, that the bulk of McEachin's information was delivered to the police before the alleged threats occurred, so there is reason to question the applicability of this argument
 
 
 [8]
 We could imagine drawing a different conclusion if the police had possessed information that Dawkins had a bomb or other extremely volatile substance within his apartment--even if, as was the case here, it was apparently uninhabited when they approached. See, e.g., United States v. Lindsey, 877 F.2d 777 (9th Cir.1989) (police possessed information from co-conspirator about presence of bombs in apartment); see also Mincey v. Arizona, 437 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978) ("The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.") (citation omitted)
 
 
 [9]
 Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), had left the notion of "exigent circumstances" undefined. Commentators observed, however, that the case contemplated "that a broader range of exigent circumstances (not just the extent 'hot pursuit' rule of Hayden and Santana ) would excuse the failure to have a warrant authorizing an arrest entry." WAYNE R. LAFAVE, SEARCH AND SEIZURE Sec. 6.1(f) at 595 (2d ed. 1987). LaFave turns to the criteria enumerated in Dorman v. United States, 435 F.2d 385 (D.C.Cir.1970), to flesh out the exception. LAFAVE, supra, at 595-98
 
 
 [10]
 In Lindsey, the court drew further inferences from the fact that the police there entered a motel room in alleged "hot pursuit" of fleeing bank robbers by pass key. We observed that this fact, plus the fact that it was "just as likely" the defendant would not return to a motel room that he knew had attracted police suspicion, cast doubt on the government's assertion that the police knew the suspect was on the premises. See id. at 172-73. The same inferences could be drawn in this case
 
 
 [11]
 We are mindful, in drawing this conclusion, that even had Dawkins been in Apartment 104, he could not in that situation have posed any threat to McEachin if the police had precluded his exit. This case thus stands in marked contrast to cases in which informants are potentially in danger within an apartment. See, e.g., United States v. Dowell, 724 F.2d 599, 602 (7th Cir.1984) (informant, who had gone into defendant's apartment, failed to make prescheduled call checking in); United States v. Williams, 633 F.2d 742, 744 (8th Cir.1980) (informant, inside defendant's apartment, was about to be placed in serious jeopardy by discovery of fake cocaine)
 
 
 [12]
 As the Supreme Court clarified in Murray v. United States, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988), "[t]he inevitable discovery doctrine, with its distinct requirements, is in reality an extrapolation from the independent source doctrine: Since the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered." Id. at 539, 108 S.Ct. at 2534 (emphasis in original)
 
 
 [13]
 After describing the two guns observed in plain view in the back bedroom closet, the affidavit concluded that "it is the belief of the affiant that [Apartment 104] contains at least two weapons and based on this information it is respectfully requested that a search warrant be issued for this [sic] premises." Application and Affidavit for Search Warrant, Nov. 13, 1989, reprinted in Joint Appendix at 2-3