14 A.3d 1087 (2011)
In re K.H., Appellant.
No. 05-FS-794.
District of Columbia Court of Appeals.
Argued June 2, 2010.
Decided March 3, 2011.
*1088 Mara Silver, Public Defender Service, with whom James Klein, Samia Fam, and Jaclyn S. Frankfurt, Public Defender Service, were on the brief, for appellant.
Sidney R. Bixler, Assistant Attorney General for the District of Columbia, with whom Peter J. Nickles, Interim Attorney General at the time the brief was filed, Todd S. Kim, Solicitor General, and Rosalyn Calbert Groce, Deputy Solicitor General, were on the brief, for appellee.
Before GLICKMAN and FISHER, Associate Judges, and STEADMAN, Senior Judge.
GLICKMAN, Associate Judge:
K.H. appeals his delinquency adjudication for armed robbery and possession of an imitation pistol. He contends the trial court erred by denying his Fourth Amendment motion to suppress the evidentiary fruits of a warrantless, non-consensual intrusion by police into an apartment in which he had a reasonable expectation of privacy as an overnight guest. Because the prosecution failed to prove the police had probable cause to enter the apartment, we agree with appellant that the intrusion violated his Fourth Amendment rights. As we cannot find the erroneous admission of the subsequently-acquired evidence to have been harmless beyond a reasonable doubt, we must reverse appellant's delinquency adjudication and remand for a new trial.[1]

I.
Appellant was charged with the armed robbery of Ms. Vina Vo on January 28, 2005. As she testified at trial, Ms. Vo was walking in the area of 13th and Kenyon Streets, N.W., when she was accosted by several youths, one of whom displayed a handgun and took her wallet. Ms. Vo described the robber to police as a young black man, about 5 feet 5 inches tall and weighing around 150 pounds.
Four days later, on February 1, 2005, police officers responding to a complaint of an attempted robbery in the area of 11th and Harvard Streets, N.W., pursued the suspect into an apartment building located at 1012 Harvard Street (roughly a block away). There were four apartments in the building. The officers discovered appellant inside apartment number three and showed him to the complainant, Ms. Katherine Wolf. After she identified appellant as her assailant, the officers arrested him, photographed him, and transported him to the police station, where he waived his Miranda rights and agreed to answer questions. In the ensuing interrogation, appellant admitted to having been present during the robbery of Ms. Vo on January 28, though he denied having participated in it. A few days later, the police showed appellant's February 1 arrest photo to Ms. Vo. She identified appellant from the photo *1089 as the person who took her wallet. She later identified him in person when she testified at his trial.[2]
Alleging that the police violated his Fourth Amendment rights by entering and searching apartment three on February 1 without a search warrant, appellant moved to suppress his statement to police and Ms. Vo's out-of-court and in-court identifications of him as the fruits of that violation. The District opposed the motion. It contended that because the police were pursuing the person who had attempted to rob Ms. Wolf, their intrusion into apartment three was justified under the exigent circumstances exception to the warrant requirement. To prove the applicability of that exception, the government relied at the pretrial suppression hearing on the testimony of Detective Robert Thompson.
Having arrived on the scene some time after the police entered apartment three and found appellant there, Detective Thompson had no personal knowledge of the circumstances giving rise to the entry. He based his testimony on information he had acquired from other police officers whom he did not identify and from Ms. Wolf. According to Detective Thompson, the police went to 1012 Harvard Street because Ms. Wolf told them her assailant had just fled there.[3] Detective Thompson said it was his "understanding" that after the officers entered the building, they overheard persons speaking inside apartment three. As far as the detective knew, "[t]here was some talk about the police being outside" and "[t]here was mention of someone going to run or something like that," "[s]omething about running." The officers then gained entry to the apartment. Detective Thompson testified that "[t]hey were allowed in. I mean they didn't force their way in." There were several people in the apartment. The police found appellant hiding in a closet. An "adult female" who was present told the officers that he had run into the apartment "just before the police had gotten there."
To establish his standing to challenge the search of apartment three, and to rebut Detective Thompson's implicit claim that the incursion was consensual, appellant called Ms. Sabrina Shields as a witness. Ms. Shields testified that she lived in the apartment and that appellant, her godson, usually slept there on the weekends. He also had stayed there the night before his arrest, said Ms. Shields, and he was planning to sleep there that evening as well.[4] When the police arrived on February 1, Ms. Shields was in her living room. The officers announced their presence by "banging" on her door and saying, "[P]olice, police, open up. ... [O]pen up before we kick your door in." Ms. Shields opened the door. Over ten police officers rushed in with their guns drawn and ordered everyone present to "get on the floor." When Ms. Shields asked them why they had come, "they just said a robbery occurred and some people might have came [sic] in my house." The officers proceeded to search the entire apartment.[5]
*1090 The trial court denied appellant's motion to suppress. As the court clarified in its findings on remand (see footnote 1, supra), it credited Ms. Shields' testimony and found that (1) the police lacked consent to enter apartment three, and (2) appellant was an overnight guest in the apartment who therefore had standing to challenge the entry.[6] Although the police did not have a warrant, the court found it unnecessary to decide whether their entry into apartment three was justified by what they knew and the exigencies of the situation. Even if the police violated appellant's Fourth Amendment rights, the court reasoned, the evidence appellant sought to suppress was not the suppressible fruit of that violation, because the police had probable cause to arrest appellant once Ms. Wolf identified him as the person who had attempted to rob her.

II.
"`[A]n unconsented police entry into a residential unit, be it a house or an apartment ... constitutes a search'" subject to the requirements of the Fourth Amendment.[7] Ordinarily, the Fourth Amendment requires the police to obtain a warrant supported by probable cause before they lawfully may enter a home without proper consent to search for a suspect or make an arrest.[8] The existence of exigent circumstances, as where the police are in hot pursuit of a fleeing felon, may justify such an intrusion without an arrest or search warrant.[9] But the presence of circumstantial exigencies does not relax the requirement of probable cause.[10] "All searches of the home, whether by warrant or pursuant to a recognized exception, must be supported by some form of probable *1091 cause."[11] Thus, although the District claims the police did not need a warrant to enter apartment three because they were in hot pursuit of an armed robber, it still bore the burden of proving the police had probable cause to believe the robber had entered that apartment minutes earlier.[12]
In our view, the District did not carry that burden.[13] Instead of offering the testimony of one of the officers who entered apartment three in pursuit of the fleeing robber, it relied exclusively on the hearsay testimony of Detective Thompson, a witness who possessed no personal knowledge of the entry. Trustworthy hearsay is admissible in a suppression hearing and may justify a finding of probable cause.[14] However, Detective Thompson's testimony was, on the essential point, too unreliable and uncertain to support such a finding. The detective could say only that it was his "understanding" the officers entered apartment three because they overheard "some talk [inside the apartment] about the police being outside" and some "mention of someone going to run or something like that." The deficiencies in this testimony are glaring. Detective Thompson never identified the source (or sources) of his "understanding"; it is impossible to know whether the detective spoke to anyone with personal knowledge of what the police overheard or whether *1092 his account involved multiple levels of hearsay. Without such knowledge, one cannot reasonably conclude that the detective's "understanding" of what the police heard was reliable.[15] Moreover, and critically, Detective Thompson admittedly could not provide even a reasonably accurate account of what the police professed to have heard. What he reported was vague and unenlightening. By itself, the information that someone in apartment three said police were outside and "something about running" does not demonstrate that an officer of "reasonable caution"[16] would have been warranted in believing the robber had gone into the apartment.
The police apparently had no other information linking the robbery suspect to apartment three. Their sole source of information, Ms. Wolf, merely told them her unknown assailant ran into the building at 1012 Harvard Street; she did not claim to have seen where he went after that. Nor does the record indicate that the police zeroed in on apartment three by a process of elimination, after excluding the other apartments in the building as possible hiding places. Of course, what the police learned inside apartment three cannot be considered in evaluating the lawfulness of the intrusion.[17]

III.
Evidence derived, directly or indirectly, from violation of a defendant's Fourth Amendment rights is subject to exclusion at the defendant's trial unless the prosecution demonstrates that "the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the `taint' imposed upon that evidence by the original illegality."[18] In the present case, as the District all but concedes, that exclusionary rule applies not only to the evidence acquired by police inside apartment three,[19] but also to Ms. Vo's out-of-court identification of appellant from his post-arrest photograph[20] and to appellant's custodial statements following his arrest.[21] This is not a case where the police had probable cause or even reasonable articulable suspicion to detain appellant before they found him hiding inside apartment three.[22] And no subsequent intervening event sufficient to dissipate the taint of the Fourth Amendment violation was shown.[23] *1093 That appellant was given Miranda warnings and validly waived his Fifth Amendment right to remain silent was not enough to disinfect his statements to the police while he was in custody following his arrest.[24] Nor did Ms. Wolf's on-scene show-up identification of appellant purge the taint. Although "the acquisition of probable cause through independent means" may sever the causal connection between a Fourth Amendment violation and subsequently-obtained evidence,[25] that did not occur here, because Ms. Wolf's identification was itself the fruit of the Fourth Amendment violation.[26] Probable cause acquired by the police via such exploitation of the illegality cannot sever the causal linkage.[27]
Ms. Vo's in-court identification of appellant at trial stands on a different footing. As the Supreme Court explained in Crews, a victim's independent ability to recognize the defendant at trial based on her observation of him at the time of the crime is not a fruit of the defendant's unlawful arrest.[28] Thus, so long as Ms. Vo's in-court identification was not influenced unduly by her prior out-of-court identification of appellant, it was admissible. This will be a matter for the trial court to determine on remand for purposes of any future re-trial.[29]
Even assuming that Ms. Vo's identification of appellant at his trial was admissible, we cannot conclude that the constitutionally erroneous introductions of her out-of-court identification and appellant's statement to the police were harmless beyond a reasonable doubt. This was a one-witness identification case  "a difficult identification case" by the judge's own estimation. Among other things, the defense proved that appellant did not match Ms. Vo's description of her assailant.[30] The only significant corroboration of Ms. Vo's in-court identification of appellant was supplied by her out-of-court identification of him from his photo and by appellant's incriminating admission to the police that he was at the scene of the robbery  i.e., by the evidence that should have been suppressed. The judge described this corroboration as "pretty telling." Under these circumstances, we cannot say that *1094 the courtroom identification was "so overwhelming" that the improperly admitted evidence "did not contribute to the verdict in any way."[31]
For the foregoing reasons, we reverse appellant's delinquency adjudication and remand the case for a new trial in which the evidentiary fruits of the Fourth Amendment violation must be excluded.
So ordered.
NOTES
[1] Our resolution of this appeal was delayed by the parties' joint motion prior to oral argument, which we granted, to remand the record for the trial court to make factual findings with respect to appellant's Fourth Amendment motion. The trial court issued its findings on April 30, 2009, and certified the record back to this Court. Although the parties then requested the court to make supplemental findings, the court ruled that it lacked jurisdiction to do so. We deem it unnecessary to remand the record a second time for more findings.
[2] The charges against appellant arising from the February 1 attempted robbery of Ms. Wolf were disposed of separately and are not at issue in this appeal.
[3] When asked how quickly the police responded after receiving Ms. Wolf's call for assistance, Detective Thompson said he thought "the whole thing happened within a realm of ten minutes." Although appellant argues that Ms. Wolf could not have directed the police to 1012 Harvard Street specifically, the court credited Detective Thompson's testimony that she did so.
[4] February 1 was a Tuesday.
[5] At some point that afternoon, Ms. Shields testified, the police also entered two other apartments in the four-unit building. They arrested two persons in apartment four, apparently on charges unrelated to the attempted robbery of Ms. Wolf.
[6] See Minnesota v. Carter, 525 U.S. 83, 89, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998). The government does not contest either of those findings.
[7] Martin v. United States, 952 A.2d 181, 186 (D.C.2008) (quoting 1 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 2.3(b) (4th ed. 2004)); see, e.g., Penny v. United States, 694 A.2d 872, 875 (D.C.1997) ("In defining the area in which an apartment dweller may have a reasonable expectation of privacy, case law generally draws the line at the threshold of the apartment rather than the front door of the apartment building."); United States v. Dorsey, 192 U.S.App. D.C. 313, 319, 591 F.2d 922, 928 (1978); Moore v. United States, 149 U.S.App. D.C. 150, 152, 461 F.2d 1236, 1238 (1972).
[8] Payton v. New York, 445 U.S. 573, 576, 584, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (holding that Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest"). See also id. at 602-03, 100 S.Ct. 1371 ("If there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law. Thus, for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.").
[9] See Dorman v. United States, 140 U.S.App. D.C. 313, 320-21, 435 F.2d 385, 392-93 (1970) (en banc); see also, e.g., United States v. Santana, 427 U.S. 38, 42-43, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976) (holding that hot pursuit excuses failure to secure warrant).
[10] See Santana, 427 U.S. at 42, 96 S.Ct. 2406 ("In Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), we recognized the right of police, who had probable cause to believe that an armed robber had entered a house a few minutes before, to make a warrantless entry to arrest the robber and to search for weapons.") (emphasis added); cf. Dorman, 140 U.S.App. D.C. at 320, 435 F.2d at 392 (suggesting that intrusion into the home without a warrant pursuant to the exigent circumstances exception should be supported by "not merely the minimum of probable cause, that is requisite even when a warrant has been issued, but beyond that a clear showing of probable cause") (footnote omitted).
[11] United States v. Dawkins, 305 U.S.App. D.C. 83, 87, 17 F.3d 399, 403 (1994). "This requirement stems from the fact that an exception to the warrant preference rule excuses the government only from the necessity of going before a magistrate; it does not alter the underlying level of cause necessary to support entry." Id. See also Arizona v. Hicks, 480 U.S. 321, 328, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987) ("A dwelling-place search, no less than a dwelling-place seizure, requires probable cause, and there is no reason in theory or practicality why application of the `plain view' doctrine would supplant that requirement.").
[12] See Dawkins, 305 U.S.App. D.C. at 87-88, 17 F.3d at 403-04. This is not the exceptional case where "special needs, beyond the normal need for law enforcement," might render the probable cause requirement impracticable and justify a reasonable search based on heightened public necessity. New Jersey v. T.L.O., 469 U.S. 325, 351, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (Blackmun, J. concurring); see also United States v. United States District Court, 407 U.S. 297, 322-23, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) (acknowledging that a domestic security surveillance warrant may be granted based on reasonable standards balancing "the legitimate need of Government for intelligence information and the protected rights of our citizens"); Camara v. Municipal Court, 387 U.S. 523, 534-38, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (permitting home inspections conducted in compliance with "reasonable legislative or administrative standards" in order to serve the "reasonable" goal of enforcing municipal health and safety regulations). A genuine need to avert a grave and imminent threat to human life might justify a reasonable search on less than probable cause. Illustratively, suppose police officers were to enter an apartment building in hot pursuit of a suspect who was threatening to detonate a bomb or shoot innocent bystanders. To save lives, it might be constitutionally reasonable for the officers to search every apartment in the building to find and restrain the suspect, even if all they know is that he is somewhere inside the building. Cf. United States v. Preston, 468 F.2d 1007, 1010 (6th Cir. 1972) (upholding a search for weapons in a car parked at the crowded scene of a recent shooting as reasonably necessary to "defuse a potentially explosive situation by seizure of the firearms before that explosion occurred," despite the lack of probable cause to search the car).
[13] "Whether the police had probable cause on a given set of historical facts is a question of law subject to de novo review on appeal." Perkins v. United States, 936 A.2d 303, 305 (D.C.2007) (citing, inter alia, Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)).
[14] See United States v. Matlock, 415 U.S. 164, 172-76, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); Fleming v. United States, 923 A.2d 830, 835 (D.C.2007).
[15] Arguably, Detective Thompson's unreliability on key points was demonstrated when Ms. Shields, whom the trial court credited, testified that the officers threatened to kick in her door, in contrast to the detective's assertion that the officers "didn't force their way in" to apartment three.
[16] Perkins, 936 A.2d at 306.
[17] See, e.g., United States v. Lindsay, 165 U.S.App. D.C. 105, 110, 506 F.2d 166, 171 (1974) ("The fact that once inside the police search uncovered ample evidence to establish probable cause has no relevance here. As the Court remarked in United States v. Di Re, 332 U.S. 581, 595, 68 S.Ct. 222, 92 L.Ed. 210 (1948): `[A] search is not to be made legal by what it turns up. In law it is good or bad when it starts and does not change character from its success.' (Footnote omitted.)").
[18] United States v. Crews, 445 U.S. 463, 471, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980).
[19] For example, their observation of appellant hiding in the closet.
[20] See, e.g., Crews, 445 U.S. at 472, 100 S.Ct. 1244.
[21] See, e.g., Brown v. Illinois, 422 U.S. 590, 601-02, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).
[22] Cf. New York v. Harris, 495 U.S. 14, 18-20, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990); Oxner v. United States, 995 A.2d 205, 208-09 (D.C. 2010).
[23] Illustratively, intervening events that could suffice to break the causal chain include termination of the defendant's illegal custody, an intervening lawful arrest, consultation with counsel, or involvement by a judge or magistrate. See 6 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 11.4(b), at 296-97 (4th ed. 2004).
[24] See Brown, 422 U.S. at 601-02, 95 S.Ct. 2254; United States v. Gayden, 492 A.2d 868, 875 (D.C.1985).
[25] Al-Mahdi v. United States, 867 A.2d 1011, 1024 (D.C.2005).
[26] See Bryant v. United States, 599 A.2d 1107, 1112 (D.C.1991) (suppressing show-up identification following illegal home entry).
[27] See Hicks v. United States, 705 A.2d 636, 640-41 (D.C. 1997).
[28] See Crews, 445 U.S. at 471, 473, 100 S.Ct. 1244.
[29] Although the trial court made no express "independent source" finding with respect to Ms. Vo's courtroom identification of appellant, it stated the following:

The court is satisfied that as a matter of law the identification [of appellant by Ms. Vo] is reliable. First, the court notes that the complainant testified that the event took several minutes. The complainant testified she got a good look at the face. They were very close. There was an extended conversation. The lighting permitted her to see. She testified that she could recognize the gunman if she saw it [sic] again. The photo spread took place about a week later. She was certain at the spread. She was certain at her in court identification as well.
[30] As mentioned above, Ms. Vo said the robber was about 5 feet 5 inches tall and weighed about 150 pounds. Appellant presented medical and other evidence that he was 5 feet 11 inches tall and weighed around 140 to 145 pounds. In closing argument, the prosecutor conceded the height disparity but undertook to minimize its significance.
[31] Ellis v. United States, 941 A.2d 1042, 1049 (D.C.2008).